**Paris HALE and Catherine Hale, his wife, Plaintiffs-Appellants-Appellees,**

v.

**HOLY CROSS HOSPITAL, INC., et al., Defendants-Appellants,**

**Peter R. Sciarretta, M. D., Defendant-Appellee.**

No. 74–1736.

United States Court of Appeals, Fifth Circuit.

May 22, 1975.

Rehearing and Rehearing En Banc Denied June 18, 1975.

**316**

Robert W. Boughton, Cleveland, Ohio, William Manker, Miami, Fla., for Hale.

Frank E. Maloney, Jr., William M. O'Bryan, Fort Lauderdale, Fla., for Holy Cross Hospital.

Robert M. Montgomery, Jr., Edna L. Caruso, West Palm Beach, Fla., for Sciarretta.

Before GIBSON [*], THORNBERRY and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This is a Florida diversity personal injury case brought by Paris Hale and his wife Catherine (citizens of Ohio) against Holy Cross Hospital, Inc. (Fort Lauderdale, Florida), Dr. Peter R. Sciarretta, two nurses employed by the hospital, and the manufacturer of a therapeutic heating device known as an Aquamatic K-Pad. Plaintiffs sought damages on behalf of Paris Hale for injuries suffered as the result of alleged burns caused by the application of the aqua pad to his body, and on behalf of Catherine Hale for her services in attending her husband and deprivation of his companionship and consortium as a result of his injury. The manufacturer of the aqua pad was dismissed for lack of diversity and the case was tried against the remaining defendants, all citizens of Florida. At the conclusion of plaintiffs' case a directed verdict was granted in favor of Dr. Sciarretta and the two hospital nurses. The case went to the jury on the issue of negligence of defendant Holy Cross Hospital, resulting in a zero verdict for Catherine Hale and a verdict in the amount of $20,000 in favor of Paris Hale against the hospital from which the hospital appeals. Plaintiffs also appeal from the directed verdict in favor of Dr. Sciarretta. We affirm.

On Saturday, November 6, 1971, Paris Hale sustained a fractured left hip and was rushed to the emergency room of Holy Cross Hospital, Fort Lauderdale, Florida, at approximately 10 p. m. The patient had a previous medical history of having suffered a stroke; was also diabetic and had impaired blood circulation. Dr. Peter Sciarretta, an orthopedic surgeon on the staff of the hospital, was contacted by telephone about 10:30 p. m. by the emergency room, at which time he directed that the patient be admitted to the hospital. In a subsequent telephone call Dr. Sciarretta ordered traction and the application of an aqua pad to the patient's left hip. Nurse McIntosh, who was working the 3 to 11:30 p. m. shift, requested an aqua pad from the Central Supply room, but rejected it and returned it to the supply room because it was leaking. At the time she went off duty the pad had not been replaced. Later a pad was applied to the patient, but the record is not clear when or by whom. On the following evening, at 8 p. m., nurse McIntosh made the following notation on her report: "Buttocks appeared reddened—large area over left buttock opened. Blister on right buttock." [1] She

---

[*] Of the Eighth Circuit, sitting by designation.

1. There was conflict in the evidence in regard to whether the pad was correctly positioned.

It was defendants' contention that application of the pad to the left hip could not have caused burns on the right side of the patient.

also observed the notation by the nurse who had preceded her on the earlier shift, "Sacral area broken" and the words "Aqua Pad" under Treatment and Remarks. As a consequence of these lesions, hip surgery, which was originally scheduled for November 9, was postponed until January 28, 1972. In the interim Hale remained hospitalized for treatment of the lesions, which developed into large open ulcers.

The principal factual controversy at the trial was whether the lesions were caused from a defective aqua pad or from decubitus (bedsores), and whether because of Hale's diabetic condition and circulatory impairment the use of the aqua pad was negligence which proximately caused his injuries.

### The directed verdict in favor of Dr. Sciarretta.

Plaintiffs called as witnesses, among others, Dr. Sciarretta and Dr. David M. Gozansky, an internist on the hospital staff who had consulted with Dr. Sciarretta.

Dr. Sciarretta testified that he saw the patient for the first time about 3 a. m. on November 7, at which time he became aware of a previous cardiovascular accident from which the patient suffered some paralysis, and also that he was suffering from mild diabetes. Dr. Sciarretta had not previously read the manufacturer's printed safety requirements for the use of the pad which caution: "Keep pad temperature substantially away from dial limits shown, particularly on children, diabetics, incapacitated patients, insensitive skin areas or where poor circulation is present." He said, however, that had he known about the diabetic and circulatory problems of the patient he would have still ordered the pad. He considered the maximum temperature of 105 degrees safe. With respect to his order indicating the application of the pad, he said that it is the standard and usual custom and practice in the community and other communities not to specify in the order the temperature of the pad. He was asked whether,

based upon his familiarity with the aqua pad, he had an opinion as to its safety, to which he responded: "It is an extremely safe means of applying heat. In fact, the safest that I know of." When asked why he ordered the aqua pad rather than moist towels, his reply was: "It is the most superior appurtenance or instrument or applicable form of heat that I know of. It is used standard in my treatment as well as other orthopedic surgeons."

Dr. Gozansky corroborated the testimony of Dr. Sciarretta in regard to the propriety of using an aqua pad under the particular circumstances. When he first saw the patient on Sunday, November 7, he was aware that the pad had been ordered for application to the left hip. Knowing the patient's condition of diabetes and his incapacity, he still felt that the order and the treatment were proper. He said that aqua pads are preferable to other forms of heat because they are known not to burn a patient. The pad's highest range of temperature (105 degrees) is a proper temperature. Dr. Gozansky was of the opinion that Dr. Sciarretta's care and treatment of the patient, including the order for the application of the aqua pad, were excellent and in keeping with community standards.

Plaintiffs introduced no evidence, expert or otherwise, to contradict the testimony of Doctors Gozansky and Sciarretta, from which the jury could reasonably conclude that Dr. Sciarretta failed in his duty to use the ordinary, skill, diligence, means and methods ordinarily used by physicians in his community or similar communities. Consequently they failed in their burden to prove malpractice or negligence of Dr. Sciarretta. See Foster v. Thornton, 1936, 125 Fla. 699, 170 So. 459; Hill v. Boughton, 1941, 146 Fla. 505, 1 So.2d 610; Brown v. Swindal, Fla.App., 1960, 121 So.2d 38; O'Grady v. Wickman, Fla. App., 1968, 213 So.2d 321. Applying the standards of Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365 (en banc), the motion for a directed verdict in fa-

318

vor of Dr. Sciarretta was properly granted under these circumstances.[2]

### The jury verdict against Holy Cross Hospital, Inc.

■ The District Court correctly gave the jury a charge on the doctrine of *res ipsa loquitur* and its availability if the jury found from the evidence that the pad caused the injury. When Hale was admitted to the hospital there was no evidence of any lesions. Within less than 22 hours later the lesions appeared. Since the aqua pad was under the control and management of the hospital, the doctrine of *res ipsa loquitur* is applicable. See West Coast Hospital Ass'n v. Webb, Fla., 1951, 52 So.2d 803; Southern Florida Sanitarium & Hospital, Inc. v. Hodge, Fla.App., 1968, 215 So.2d 753. Defendant hospital admits that *res ipsa loquitur* is applicable in approriate cases, in a claim of injury by a patient against a hospital, but contends that the charge was erroneous because there was no evidence from which the jury could conclude that the aqua pad was the cause of plaintiff's injury. An examination of the evidence convinces us otherwise.

■ The lesions on the buttocks of the patient were observed by nurse McIntosh at 8 p. m. on Sunday, November 7, just 21½ hours after he was admitted to the hospital. A previous entry by the nurse on the preceding shift showed, "Sacral area broken" and indicated that an aqua pad was being used. Inasmuch as Hale was not suffering from this condition when he entered the hospital, it is obvious that the lesions formed no more than 21½ hours after his admission. Dr. Gozansky testified that when he first noticed the condition of the patient's buttocks his impression was that he had sus-

tained a third-degree burn, probably due to the aqua pad. On a prior deposition he likewise attributed the burn to the aqua pad. The speed of the development of the lesion supported his opinion that it was a burn rather than a pressure sore. The medication he prescribed for the lesion is usually used for burns. Dr. Gozansky later testified that his assumption of a burn caused by an overheated pad was based on his observation of the nurse's notes of a defective aqua pad.

Dr. Sciarretta's testimony was conflicting. A handwritten notation by him on the patient's medical chart shows: "Fracture of left hip. Third degree burn, left and right buttocks." The final discharge summary dictated and signed by him shows: "The patient was scheduled for surgery, however, prior to surgery he developed third degree burns of the buttocks as a result of Aqua Pad malfunctioning." The day after Hale was admitted, Dr. Sciarretta prescribed medication and instructed that the patient be kept "off the burns at all times." One day after that he examined the burned area and noticed that "on both buttocks there were open areas which were nasty looking: Red, with blisters and seepage, sort of a protein-type seep." In his progress notes of the same day, however, he wrote, "Case cancelled because of decubitus." At trial he admitted that as a result of Hale's developing burns he asked Mrs. Hale to secure around-the-clock nursing. Later in his testimony Dr. Sciarretta's recollection was that he had told Mrs. Hale that her husband had sustained bedsores or pressure sores. This testimony conflicted with his previous deposition in which he stated that he had informed Mrs. Hale

**2.** In *Boeing* we said: "On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the

motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury." 411 F.2d at 374.

that the lesion was a burn caused by the patient lying on the pad. He admitted that ordinarily a bedsore develops over a period of two to four days at its earliest, but said that it is difficult to distinguish a bedsore from a sore resulting from heat.

Because of these conflicts in substantial evidence upon which reasonable men could differ, the District Court correctly denied the motion for a directed verdict in favor of the hospital since it was apparent that the issue of the hospital's negligence and the cause of the injury were questions for the jury's determination. See Boeing Company v. Shipman, *supra*. Thus the District Judge also correctly denied the hospital's motion for judgment notwithstanding the verdict.[3]

Affirmed.

3. Dr. Sciarretta was recalled as a witness for Holy Cross Hospital at which time he recanted the statement in his discharge summary that the injury was the result of the application of an aqua pad. Dr. William F. Hogan, the physician who treated the patient for the ulcerated condition of the buttocks, was also of the opinion that the lesion was a bedsore. This favorable evidence for the hospital did not resolve the conflict; the matter remained a question for determination by the jury.